United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DANNY M. SINGSON,                                    No. C 09-5023 SI

        Plaintiff,                              **ORDER GRANTING IN PART AND
                                                     DENYING IN PART DEFENDANTS'
  v.                                                 MOTION FOR SUMMARY JUDGMENT**

MARC FARBER, *et al.*,

        Defendants.
_____/

      On December 20, 2010, the Court held a hearing on defendants' motion for summary judgment.
For the reasons set forth below, defendants' motion is GRANTED in part and DENIED in part.  The
Court grants summary judgment in favor of defendants on plaintiff's claims of hostile work environment
and disparate treatment, and denies summary judgment on the retaliation claim.

**BACKGROUND**

      Plaintiff Danny Singson is of Filipino ancestry, and is a police officer for the Millbrae Police
Department.  Plaintiff was hired by the Department in 1998 as an officer, and in 2006 he was promoted
to Patrol Sergeant.  Plaintiff alleges that after he was promoted to Sergeant, his supervisor, Commander
Marc Farber, discriminated against him in various ways on account of his race.  Plaintiff also alleges
that Farber created a racially hostile workplace by discriminating against other Asian-American police
officers.[1]

_____

     [1]  Defendants have objected to much of plaintiff's evidence, including plaintiff's evidence in
support of his claim of a racially hostile work environment.  The Court addresses the evidentiary
objections to the extent necessary to the resolution of the issues presented by defendants' motion for
summary judgment.

**United States District Court**
For the Northern District of California

All Millbrae Patrol Sergeants have collateral duties in addition to their patrol and supervisory responsibilities. When plaintiff was promoted to Patrol Sergeant, he was assigned three collateral duties: preparing the department's work schedule for officers and sergeants; supervising the Field Training Officer ("FTO") program; and supervising the Explorer Program (a youth and law enforcement training program). Defendants assert that plaintiff made numerous errors when preparing the work schedule, and that these errors led the department to incur unnecessary and costly expenses in the form of overtime. For example, on December 30, 2007, Farber met with plaintiff about scheduling errors that Singson made for the December 30 and 31 shifts. Farber Decl. ¶ 10, Ex. C. Plaintiff does not dispute that he neglected to properly staff two shifts on those days, and that as a result of his scheduling mistakes, the department paid 35 hours of unnecessary overtime to properly cover the two shifts. It is undisputed that plaintiff was counseled by Farber about these and other scheduling errors. Plaintiff admits that he made errors, but also asserts that he did not receive training regarding how to prepare the work schedule, and he notes that despite these errors, Farber has testified that as of January 2008, Farber considered plaintiff's performance as "above average." Farber Depo. at 89:10-14 (Scott Decl. Ex. 5).

Defendants also assert that plaintiff's supervision of the FTO program was deficient. According to defendants, in 2007 and 2008, Farber determined that plaintiff was not properly monitoring officers' progress in the FTO program because plaintiff was not holding regular meetings with the trainees or the FTOs who were training them, and plaintiff was not preparing supervisory reports. Defendants assert that as a result, plaintiff was unaware of problems the trainees were experiencing in the course of their training, and plaintiff did not provide guidance to the FTOs about how to modify the training to address the problems. In addition, defendants assert that plaintiff did not ensure that the trainees' files were complete with all necessary reports. Defendants have submitted evidence supporting their assertion that plaintiff's supervision of the FTO program was deficient. *See* Farber Decl. ¶¶ 11-12, 14, Ex. C-G. Plaintiff's opposition papers do not respond to most of the specific identified deficiencies. However, plaintiff asserts that he was being unfairly criticized by being held responsible for failing to identify inadequacies that the FTO supervisory officers failed to note on the daily activity reports.

In February 2008, Farber assigned plaintiff the job of investigating an Internal Affairs complaint

2

against another police officer, Menh Trieu.  Mr. Trieu is Laotian.  The IA complaint was initiated by Sergeant Aronis.  Singson Decl. ¶ 4.  Plaintiff had recently completed training in conducting internal affairs investigations.  Hitchcock Decl. ¶ 4; Singson Decl. ¶ 4.  Plaintiff states that he was the most junior sergeant in the department, and he suggests that given the seriousness of the charge against Mr. Trieu (untruthfulness), the IA investigation should have been assigned to a more senior sergeant.

In July 2008, plaintiff did not sustain the charges of untruthfulness against Mr. Trieu.  Plaintiff claims that Farber assigned him the IA investigation to shield the department from possible charges of racial bias by Trieu, and to test plaintiff's loyalty to Farber: "I now believe that this assignment was designed (1) to test my loyalty to Marc Farber and (2) to use me, as an Asian officer, to deflect allegations of discrimination that would be made by Officer Trieu."  Singson Decl. ¶ 8.  Defendants properly object that this is speculation on plaintiff's part, and that there is no evidentiary basis for this assertion.  Plaintiff also states in his declaration that "Farber had a close relationship with John Aronis [and] [i]t appeared that Marc Farber was attempting to influence the investigation and steer it to an outcome that would result in Officer Trieu's termination.  Marc Farber attended and participated in my interview of Officer Trieu.  He told me that he thought Officer Trieu was lying and 'we just need to prove it.'"  Singson Decl. ¶ 6.  Defendants properly object to the first sentence as lacking any foundation that Farber and Aronis were close friends, and that plaintiff's belief that Farber was "attempting to influence the investigation" is speculative.  In any event, it is undisputed that plaintiff conducted the IA investigation of Trieu, and that he did not sustain the charges.  Plaintiff claims that after he did not sustain the charges against Trieu in July 2008, he became Farber's target.

In September 2008, Farber initiated a suspension relating to plaintiff's "voiding" or "fixing" a parking ticket for a local merchant.  Plaintiff received a one-day suspension without pay.  Plaintiff claims, and has submitted evidence in support, that he was singled out for this discipline because it was common practice in the department for police officers to void tickets.

In December 2008, plaintiff and his team participated in a high-speed pursuit that passed through Millbrae.  Farber testified in his deposition that the following morning, at the suggestion of another officer, Farber viewed the patrol car video of the pursuit.  Farber Depo. at 135:23-136:10 (Gabel Decl. Ex. E).  Farber testified that as he was watching the video, Chief Hitchcock came into his office and

watched the video with him.  *Id.* at 139:4-16.  According to Chief Hitchcock, the video showed one of the officers supervised by plaintiff engaged in a high-speed pursuit within city limits.  Chief Hitchcock states in his declaration,

> The recording indicated that at one point the officer was driving close to 100 mph on El Camino Real, which has a speed limit of 35 miles per hour.  This represented an extremely dangerous situation.  The officer stopped at one point and sought direction from Plaintiff.  Plaintiff directed the officer to continue the pursuit in a manner that I considered to reflect questionable judgment and that presented significant safety concerns.  Based on what I saw in the videos, I immediately contacted the City Manager/Deputy City Manager to discuss possible disciplinary action for Plaintiff's failure to handle the pursuit situation safely and lack of judgment in his supervision of the subordinate officer.  I also made the decision to place Plaintiff on administrative leave pending further investigation of the incident and a decision as to whether disciplinary action would be taken. I directed Commander Farber to take Plaintiff's gun, badge and ID and to place him on administrative leave when Plaintiff returned to duty and pending my meeting with Plaintiff.  Commander Farber met with Plaintiff when he returned to the police station and secured Plaintiff's gun, badge and ID as I had directed. I later met with Plaintiff and, after discussion of the incident with him, decided that disciplinary action would not be taken and returned his gun, badge and ID.

Hitchcock Decl. ¶ 6.  Plaintiff asserts that Farber contacted Chief Hitchcock and showed him the video, and that it was Farber who caused plaintiff to be placed on administrative leave.  However, the basis for these assertions is plaintiff's speculative statements in his declaration, Singson Decl. ¶ 11, and at his deposition plaintiff admitted that he was not present when Farber and Hitchcock watched the video, that plaintiff had no evidence that Farber brought the video to Hitchcock's attention, or that it was Farber, and not Hitchcock, who decided to place plaintiff on administrative leave.  Singson Depo. at 189:2-193:19 (Supp. Gabel Decl. Ex. A).

The next incident between plaintiff and Farber occurred on a Sunday morning on February 15, 2009.  Farber, while off-duty, observed three police vehicles parked near Peter's Café in Millbrae. Farber states that he went inside the restaurant to see who was inside because approximately two weeks earlier a citizen had complained about seeing three police officers eating breakfast at a restaurant in Burlingame; according to Farber, after receiving the complaint, he asked plaintiff if it had been him and his team, plaintiff stated that it was, and Farber instructed him not to eat in public with his entire patrol team at once.  Farber Depo. at 203:3-205:10 (Gabel Decl. Ex. E).  On February 15, 2009, Farber entered the restaurant and found plaintiff and two members of plaintiff's team having breakfast.  The parties agree that plaintiff attempted to speak to Farber inside the restaurant, and that Farber stated he did not

4

United States District Court
For the Northern District of California

want to discuss the matter with plaintiff at that time and that they would speak on the following Tuesday at the department. Plaintiff followed Farber out into the parking lot, and plaintiff claims that Farber yelled at him and used profanity.[2] A citizen witnessed the incident and filed a complaint about Farber, who was in civilian clothes, using profanity against a police officer. Violett Depo. at 35:9-36:16 (Scott Decl. Ex. 7). Both Farber's and plaintiff's conduct were investigated. Chief Violett, who assumed the position of Chief in February 2009, sustained the allegation against plaintiff that he had failed to follow Farber's order of not having more than two officers publically gathered at an eating establishment at one time, but he also found that there were mitigating factors[3] and thus he decided to give plaintiff a non-punitive documented oral counseling. *Id.* at 38:18-40:4.[4]

In the summer of 2009, Farber brought performance issues for three sergeants, including plaintiff, to Chief Violett's attention. Violett Depo. at 56:3-12 (Gabel Decl. Ex. G). Farber expressed frustration to Chief Violett that plaintiff's performance was not improving, and that some of the performance issues had been ongoing for a year or two. *Id.* at 57:21-25. Chief Violett directed Farber to prepare a memo detailing plaintiff's performance issues as well as any relevant history. *Id.* at 58:2-18.[5] Farber prepared the memo, dated August 25, 2009, and gave it to Chief Violett. Farber Decl. ¶ 12, Ex. E. Farber's memo addressed, *inter alia*, plaintiff's scheduling errors, supervision of the FTO program, and failure to complete timely performance evaluations. *Id.*

Based on his review of Farber's memo, Chief Violett determined that disciplinary action was

---

[2] According to plaintiff, Farber yelled at him and said "You don't listen to a fucking word I say." Singson Decl. ¶ 13.

[3] Chief Violett testified that one of the mitigating factors was "[t]here was a disparity between what Sergeant Singson said to Commander Farber. And Commander Farber was very emphatic that he told them the understanding was no more than two people on a meal break at the same time. Sergeant Singson's interpretation of that was: No more than two cars at the same location at the same time. So, if you have a two-person car and a solo patrol car, then, three people could have [sic]." *Id.* at 38:18-39:6. According to plaintiff, on the morning in question the three police cars were not parked near each other.

[4] Plaintiff states in his declaration that "Farber received a slap on the wrist" as a result of the investigation. Singson Decl. ¶ 15. The record does not contain any specific information regarding the investigation of Farber or its outcome.

[5] At his deposition, Chief Violett testified that he did not direct Farber to write memos regarding the other two sergeants because the performance issues related to those sergeants involved isolated, one-time incidents. Violett Depo. at 58:19-59:11 (Gabel Decl. Ex. G).

5

1    warranted, and he issued a disciplinary notice on September 30, 2009, subject to a due process "Skelly"

2    hearing. Gabel Decl. ¶ 17, Ex. O, Plaintiff's Initial Disclosures 000016-000020; Violett Depo. at 76:11-

3    18 (Gabel Decl. Ex. G). Plaintiff's union attorney challenged the proposed discipline, and as a result

4    Chief Violett rescinded the initial notice of discipline and initiated an Internal Affairs investigation

5    instead. Chief Violett assigned the investigation to Commander Mark Rafaelli. Gabel Decl. ¶ 17, Ex.

6    O, Plaintiff's Initial Disclosures 000023-000026; Violett Depo. 87:22-88:7 (Gabel Decl. Ex. G); Singson

7    Depo. Ex. 7 (Gabel Decl. Ex. E).

8        Rafaelli began the investigation in November 2009. Rafaelli Decl. ¶ 13. As part of that

9    investigation, Rafaelli interviewed plaintiff, Farber, and several other Millbrae officers and sergeants.

10    *Id.* At the conclusion of his investigation, Rafaelli sustained most, but not all, of the allegations against

11    plaintiff. *Id.* Rafaelli also found a number of mitigating factors relevant to any potential discipline

12    against plaintiff. *Id.*

13        Plaintiff filed this lawsuit in October 2009 against Farber and the City of Millbrae. Because

14    Farber was named as a defendant, Chief Violett assigned Rafaelli to supervise plaintiff. As a result of

15    this assignment, Rafaelli supervised plaintiff in his duties as patrol sergeant, and Farber remained the

16    Patrol Commander and continued to supervise the other four patrol sergeants. In December 2009, Farber

17    was injured on duty, and at some point after that Rafaelli assumed the position of Patrol Commander.

18        In a letter dated December 17, 2009, Chief Violett provided plaintiff with notice of a new

19    disciplinary action against plaintiff, proposing a one-week suspension for the misconduct sustained by

20    Rafaelli's investigation. Singson Depo. Ex. 7 (Gabel Decl. Ex. D). On January 14, 2010, Chief Violett

21    met with plaintiff and his representative to discuss the proposed discipline, and by letter dated January

22    20, 2010, Chief Violett informed plaintiff that he would be disciplined in the form of a one-step

23    reduction in pay grade for a period of time equivalent to two paid work days (24 hours). *Id.*

24        In connection with the resolution of the disciplinary matter, Chief Violett also decided to place

25    plaintiff on a Performance Improvement Plan ("PIP"). Violett Depo. at 140:2-141:5 (Gabel Decl. Ex.

26    G). Chief Violett, Rafaelli and Farber prepared the PIP, and the Human Resources department reviewed

27    the PIP before it was issued. *Id.* at 141:18-142:6. The PIP was issued to plaintiff in March 2010, and

28    Rafaelli continues to supervise plaintiff and his performance under the PIP. Rafaelli has both praised

United States District Court
For the Northern District of California

1  and criticized plaintiff's performance, and although he has orally counseled plaintiff on several

2  occasions, he has not issued any recommendation that plaintiff be formally disciplined.

3      Plaintiff amended the complaint in March 2010 to add a claim that Rafaelli was retaliating

4  against him for filing this lawsuit. The First Amended Complaint ("FAC") alleges three claims: (1) race

5  discrimination in violation of 42 U.S.C. § 1981, against the City of Millbrae, (2) denial of equal

6  protection and due process pursuant to 42 U.S.C. § 1983, against the City and Farber,[6] and (3) retaliation

7  in violation of the First Amendment pursuant to 42 U.S.C. § 1983, against the City and Rafaelli.

8

9                                  **LEGAL STANDARD**

10     Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and

11  admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

12  material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.

13  56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of

14  material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has

15  no burden to negate or disprove matters on which the non-moving party will have the burden of proof

16  at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to

17  support the non-moving party's case. *See id.* at 325.

18     The burden then shifts to the non-moving party to "designate 'specific facts showing that there

19  is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). To carry this burden, the non-

20  moving party must "do more than simply show that there is some metaphysical doubt as to the material

21  facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere

22  existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury

23  could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252

24  (1986).

25     In deciding a summary judgment motion, the evidence is viewed in the light most favorable to

26  the non-moving party, and all justifiable inferences are to be drawn in its favor. *Id.* at 255. "Credibility

27  _____

28     [6] At the December 20, 2010 hearing, plaintiff's counsel stated that plaintiff was not pursuing the due process claim.

1  determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts

2  are jury functions, not those of a judge [when she] is ruling on a motion for summary judgment." *Id.*

3  Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues

4  of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th

5  Cir.1979); *see also Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (observing

6  that there is no genuine issue of fact "where the only evidence presented is 'uncorroborated and

7  self-serving' testimony" (quoting *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996))). The

8  evidence presented by the parties must be admissible.  Fed. R. Civ. P. 56(e).  Hearsay statements found

9  in affidavits are inadmissible.  *Fong v. Am. Airlines, Inc.*, 626 F.2d 759, 762-63 (9th Cir. 1980).

**DISCUSSION**

12      Defendant moves for summary judgment on the following claims: (1) race discrimination in

13  violation of 42 U.S.C. § 1981; (2) deprivation of equal protection pursuant to 42 U.S.C. § 1983; and (3)

14  First Amendment retaliation pursuant in violation of 42 U.S.C. § 1983.

**I.      Race discrimination: § 1981 and § 1983**

**A.      Hostile work environment**

18      Hostile work environment claims are cognizable under § 1981, and the "legal principles guiding

19  a court in a Title VII dispute apply with equal force in a § 1981 action." *Manatt v. Bank of America*,

20  339 F.3d 792, 797 (9th Cir. 2003).   To establish a *prima facie* case for a hostile work environment

21  claim, plaintiff must raise a triable issue of fact as to whether (1) he was subjected to verbal or physical

22  conduct because of his race, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe

23  or pervasive to alter the conditions of his employment and create an abusive work environment.  *Surrell*

24  *v. California Water Serv.*, 518 F.3d 1097, 1108 (9th Cir. 2008).   In considering whether the

25  discriminatory conduct was "severe or pervasive," the Court looks to "all the circumstances, including

26  the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or

27  humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's

28

**United States District Court**
For the Northern District of California

8

work performance.'" *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1110 (9th Cir. 2000) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998)).

Defendants contend that they are entitled to summary judgment on plaintiff's hostile work environment claim because there is no evidence that plaintiff was subjected to verbal or physical conduct because of his race. Indeed, plaintiff does not claim that Farber or Rafaelli ever used a racial slur against plaintiff or anyone else in the department.[7] Instead, plaintiff argues that he has circumstantial evidence of a racially hostile environment because he has submitted evidence that Farber subjected him and other Asian-American officers (George Le, Dan Young, Dan Hampton, and Menh Trieu) to unwarranted discipline and heightened scrutiny. However, plaintiff's evidence does not support the claim that Farber created a racially hostile environment.

With respect to George Le, plaintiff asserts that "Le was singled out for close scrutiny by Farber and had his FTO program extended," and plaintiff cites his own declaration as support for that statement. Opposition at 1:12-13. Plaintiff's declaration states, "As supervisor of the FTO Program it was brought to my attention that Marc Farber singled out Office George Le (Chinese) for close scrutiny and had his FTO Program extended for alleged performance reasons." Singson Decl. ¶ 35. Defendants properly object that plaintiff's statement that Farber "singled out" Le for "close scrutiny" is based on hearsay and speculation. Moreover, at his deposition, Le testified that he did not believe the FTO extension was based on his race, and that he did not feel that Farber treated him differently on account of his race. Le Depo. at 30:15-18, 33:13-23 (Gabel Decl. Ex. K).

Similarly, plaintiff's assertion that officers Dan Young and Dan Hampton chose to resign from the Millbrae Police Department due to anti-Asian "cleansing" is unsupported by any admissible

---

[7] There is one exception. Plaintiff asserts that at a supervisors' retreat, Sergeant Fregosi referred to Trieu as "Maddox," and that Fregosi made that comment within the presence of Commander Farber and Chief Hitchcock. Plaintiff contends that this is a racial slur because "Maddox"is the name of the adopted Cambodian son of Angelina Jolie and Brad Pitt. (At his deposition, Trieu testified he found that comment offensive because "In the Asian culture, the hierarchy and socioeconomic class of Cambodian people are on a lower scale than – probably the lowest in the Asian community." Trieu Depo. at 20:11-25 (Scott Decl. Ex. 2)). Setting aside the questions of whether "Maddox" could be considered a racial slur or whether racial bias on the part of Farber could be imputed based on Fregosi's statement, plaintiff's evidence is inadmissible hearsay. Plaintiff's evidence of the "Maddox" comment is Trieu's deposition testimony, in which Trieu states that he was not at the retreat, and someone told him that Fregosi allegedly made the "Maddox" comment.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

evidence.  Plaintiff states in his declaration that "While employed at the Millbrae Police Department I became aware of two Asian officers, Dan Young (Chinese) and Dan Hampton (Filipino), who transferred to the San Mateo County Sheriff's Department in order to get away from a work environment created by Marc Farber."  Singson Decl. ¶ 35.  There is nothing in this statement that demonstrates that plaintiff has any personal knowledge of why Officers Young and Hampton left the department, and thus this statement is inadmissible.  *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584-85 (6th Cir. 1992) ("Even if the Court were to consider the Affidavit, the statements contained therein are nothing more than rumors, conclusory allegations and subjective beliefs which are wholly insufficient evidence to establish a claim of discrimination as a matter of law.").  Plaintiff's opposition states that Young has not been deposed or identified as a witness, and thus aside from plaintiff's inadmissible statement, there is nothing in the record regarding Mr. Young.  Mr. Hampton was deposed, and while he testified that he felt he "was a target for Marc," and he learned that Farber said that Hampton "had Alzheimer's disease," he did not know whether Farber's conduct had to do with Hampton's race, age, or that "they wanted to get rid of people that maybe had too much wages or too much – I don't know." Hampton Depo. at 12:16-14:14, 26:17-19 (Scott Decl. Ex. 1).[8]  Hampton also testified that Farber never disciplined him and that he "passed [Farber's] evaluation."  *Id.* at 14:18-15:1.  There is nothing in Hampton's testimony, or anywhere else in the record, to support plaintiff's claim that Hampton left the department due to an anti-Asian environment created by Farber.

Finally, plaintiff relies on Menh Trieu's deposition testimony to support his assertion that Farber discriminated against Trieu on the basis of Trieu's ethnicity, which is Laotian.  Trieu testified that he believed Farber singled him out and discriminated against him on the basis of his ethnicity.  *See, .e.g.*, Trieu Depo. at 109:22-112:20 (testifying that nobody ever said anything to him about his race (aside from the "Maddox" comment) but that he felt that people "looked down" at him because of his race) (Gabel Decl. Ex. M).  However, Trieu's subjective belief that Farber singled him out on account of his race or ethnicity is insufficient to establish a *prima facie* case of race discrimination against Trieu, let

---

[8]  Mr. Hampton testified, *inter alia*, that "I just felt that everybody was under the gun, I guess, in a sense that you're walking on eggs around there. . . . There were quite a few people being AL'd [put on administrative leave].  Some of them were white, and some of them, you know, weren't, I guess." *Id.* at 26:1-12.

United States District Court
For the Northern District of California

alone a racially hostile work environment claim for plaintiff.  *See Rodriguez v. Int'l Business Machines*, 960 F. Supp. 227, 231 (N.D. Cal. 1997) ("Plaintiff's subjective belief that IBM's actions were discriminatorily motivated simply is not sufficient to withstand summary judgment."); *see also Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005) ("Although the Thorntons maintain that defendants made a race-based classification, they have not offered evidence of racial discrimination, beyond the observation that Mrs. Thornton is Native American.").

Thus, plaintiff has not raised a triable issue of fact as to the first element of a *prima facie* case of a hostile work environment claim, namely that he was subjected to verbal or physical conduct on account of his race.  Nor has plaintiff raised a triable issue of fact as to whether the conduct at issue was sufficiently severe or pervasive to create a hostile work environment.  The Court finds instructive *Vasquez v. County of Los Angeles*, 349 F.3d 634 (9th Cir. 2003), in which the Ninth Circuit found that the plaintiff failed to establish that conduct was severe or pervasive enough to establish a hostile work environment.  There, the plaintiff complained that defendants made statements that he had "a typical Hispanic macho attitude" and that he should consider transferring to the field because "Hispanics do good in the field."  *Vasquez*, 349 F.3d at 643.  Additionally, plaintiff cited two instances where one defendant yelled at him and two false complaints about his work.  The court concluded that this conduct, which included two race-related remarks, as well as a few other isolated incidents, was not sufficiently severe or pervasive.  *Id.* at 644.  Here, the instances of hostility cited by plaintiff do not even rise to the level of the conduct in *Vasquez*, because plaintiff does not contend that anyone ever made a race-related remark to or about him.  *Cf. McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1114-15 (9th Cir. 2004) (reversing summary judgment and finding issues of fact on hostile work environment claim where plaintiff was frequently subjected to racial insults by supervisors and coworkers, racist graffiti appeared regularly in the bathroom and on equipment, and plaintiff's supervisor subjected him to dangerous work conditions).  Accordingly, defendants' motion for summary judgment on the hostile work environment claim is GRANTED.

United States District Court
For the Northern District of California

**B.     Disparate treatment**

Defendants move for summary judgment on plaintiff's claim of disparate treatment.[9]  Under § 1981, courts employ the same burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805 (1973), that is used to evaluate claims of retaliation and disparate treatment under Title VII.  *See Metoyer v. Chassman*, 504 F.3d 919, 930-31 (9th Cir. 2007).  Once a plaintiff establishes a *prima facie* case of discrimination, the employer must offer a legitimate, nondiscriminatory reason for the adverse employment decision.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000); *Collings v. Longview Fibre Co.*, 63 F.3d 828, 833-34 (9th Cir. 1995); *Smith v. Barton*, 914 F.2d 1330, 1340 (9th Cir. 1990).  If the employer meets this burden, the plaintiff may produce either direct evidence of discriminatory motive, which need not be substantial, or circumstantial evidence that is "specific and substantial" evidence of pretext.  *See Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221-22 (9th Cir. 1998).

**1.     *Prima facie* case**

Defendants contend that plaintiff cannot make out a *prima facie* case of race discrimination.  In order to establish a *prima facie* case, plaintiff must show that "(1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination."  *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004).[10]  The Ninth Circuit has repeatedly emphasized

---

[9] Defendants correctly note that the FAC does not actually allege a claim for disparate treatment, and plaintiff's "claim" for disparate treatment was first raised in plaintiff's opposition to defendants' motion for summary judgment.  Plaintiff's opposition brief devotes two paragraphs to the disparate treatment claim, and does not specifically identify the actions which actions by Farber plaintiff alleges are discriminatory.  However, because only adverse employment actions are actionable, the Court assumes that plaintiff challenges the one day suspension without pay (for the voided parking ticket), the discipline he received after the Peter's Café incident, and the discipline he received in January 2010 after Rafaelli investigated the charges contained in Farber's August 2009 memorandum.

[10] Claims of disparate treatment under § 1981 follow the same legal principles as those applicable in Title VII cases.  *See Fonseca v. Sysco Food Servs. Of Arizona, Inc.*, 374 F.3d 840, 850 (9th Cir. 2004).

that a plaintiff's burden in establishing a *prima facie* case of discrimination is "minimal." *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1094 (9th Cir. 2005).

Defendants contend that plaintiff was not qualified for his position, as evidenced by the numerous performance issues that Farber identified beginning in 2007.  However, it is undisputed that between 1998 when plaintiff entered the Department, until 2006, when he was promoted to sergeant, plaintiff had good evaluations.  Plaintiff has submitted Farber's deposition testimony in which he states that as of January 2008, he still considered plaintiff's performance to be "above average."  Farber Depo. at 89-2-14 (Scott Decl. Ex. 5).  Further, while plaintiff acknowledges that he made some scheduling and other errors, he characterizes them as minor, and he claims that Farber unfairly criticized him for performance issues.  For example, plaintiff asserts that in October 2008 when Farber wrote a memorandum documenting plaintiff's alleged lack of attention to the FTO program and problems, Farber was unfairly holding him responsible for failing to identify inadequacies that the FTO supervisory officers failed to note on their daily activity reports.  Plaintiff has submitted evidence in support of this assertion.  *See* Kolokithas Depo. at 44:5-12 (Scott Decl. Ex. 4) (testifying that he was involved in the FTO program and his belief that plaintiff was unfairly criticized for his handling of the program because "[i]f the Training Officer can't identify the issue, how exactly is the Sergeant of the Training Program supposed to identify it by reading the report, which doesn't document it?").[11]  The Court finds that there are disputes of fact as to whether plaintiff was performing his job satisfactorily such that summary judgment on this ground is not appropriate.

Defendants also contend that plaintiff cannot show that similarly situated individuals outside his protected class were treated differently, or other circumstances surrounding the adverse employment action giving rise to an inference of discrimination.  The Court disagrees, and finds that plaintiff has submitted evidence establishing this element of the *prima facie* case.  For example, in September 2008, Farber initiated a suspension relating to plaintiff fixing or "voiding" a parking ticket for a local merchant.  Plaintiff has submitted evidence suggesting that he was singled out for discipline despite the fact that voiding tickets was a common practice in the department.  *See* El Haddad Depo. at 50:11-52:1

---

[11]  Defendants object to this testimony as lacking foundation.  The Court OVERRULES this objection, as Kolokithas testified that he was involved in the program.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

(Scott Decl. Ex. 8) (testifying that while he was a Parking Enforcement Officer, "multiple" sergeants and officers had him void parking tickets); *see also* Grogan Depo. at 46:5-25 (Scott Decl. Ex. 3 (Millbrae Police Sergeant testifying based on his experience that "It was not uncommon for members of the organization to use their discretion relative to not processing a parking citation that was issued to a merchant; that had gone on in the organization" and that he was not aware of any other officers who were ever investigated for using their discretion to pull a parking citation for a merchant); Kolokithas Depo. at 47:18-48:1 (testifying that Chief Violett told him that "he had looked into it, and found that there were others" who had fixed parked tickets).[12]

Defendants argue that plaintiff's evidence of similarly situated individuals is insufficient because plaintiff does not have specific evidence of other individuals who voided tickets and who were treated differently.  However, the Ninth Circuit has stated that "[e]ven though a comparison to 'similarly situated' individuals may be relevant both to plaintiffs' *prima facie* case and proof of pretext, these inquiries constitute distinct stages of the *McDonnell Douglas* burden-shifting analysis. . . . The difference between the first and third steps of the *McDonnell Douglas* framework is not without some consequence.  Among other things, a plaintiff's burden is much less at the *prima facie* stage than at the pretext stage."  *Hawn v. Executive Jet Mgmt., Inc.*, 615 F.3d 1151, 1158 (9th Cir. 2010).  The Court finds that plaintiff's evidence is sufficient to establish a *prima facie* case.

## 2.    Legitimate nondiscriminatory reason

Because plaintiff has produced sufficient evidence to establish a *prima facie* case, the burden shifts to defendant to articulate a "legitimate nondiscriminatory reason" for the adverse employment action. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 354-55 (1981). "Legitimate" reasons

---

[12]  Defendants object to this testimony by Kolokithas as hearsay.  However, Chief Violett's statement would appear to be the statement of a party-opponent and thus taken outside of the hearsay rule.  *See* Fed. R. Evid. 801(d)(2)(D) (a statement is not hearsay if it is "made by the [litigation] party's agent or servant concerning a matter within the scope of the agency or employment . . . .").

Plaintiff has also submitted evidence in support of his assertion that Farber's wife, who worked for the Burlingame Police Department, had voided a parking ticket issued to Farber.  Defendants object to this evidence as hearsay, and the Court SUSTAINS the objection.

are factually unrelated to prohibited bias, and therefore, if true, would preclude a finding of discrimination. *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978).

Defendants' burden to articulate a legitimate reason, like plaintiff's burden to make his *prima face* case, is not onerous. *Bd. of Trs. of Keene State Coll. v. Sweeney*, 439 U.S. 24, 25 (1978). The Court finds that defendants have met their burden on this step under *McDonnell Douglas*. Defendants have offered legitimate nondiscriminatory reasons for every action that Farber took, and plaintiff does not deny that he made the various scheduling errors, that there were problems with the FTO program, that the high-speed chase occurred, or that he voided the parking ticket. The presumption of discrimination created by plaintiff's *prima facie* case, "having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993).

### 3.    Pretext

In order to demonstrate discrimination in this step of *McDonnell Douglas*, plaintiff must show a discriminatory pretext for the adverse action. *See Aragon v. Repub. Silver State Disposal, Inc.*, 292 F.3d 654, 658 (9th Cir. 2002). A plaintiff may meet the burden to show pretext using either direct or circumstantial evidence. Direct evidence is evidence that "if believed, proves the fact [of discriminatory animus] without inference or presumption." *Godwin*, 150 F.3d at 1221. Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer. *See, e.g., Godwin*, 150 F.3d at 1221 (supervisor stated he "did not want to deal with [a] female"); *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1149 (9th Cir. 1997) (manager called employee a "dumb Mexican" and stated he was hired only because he was a minority). Circumstantial evidence includes evidence "showing that the employer's proffered explanation for the adverse action is 'unworthy of credence.'" *Coghlan*, 413 F.3d at 1095 (quoting *Burdine*, 450 U.S. at 256). "To show pretext using circumstantial evidence, a plaintiff must put forward *specific and substantial* evidence challenging the credibility of the employer's motives." *Vasquez*, 349 F.3d at 642 (emphasis added).

Plaintiff does not address pretext in his summary judgment opposition. *See* Plaintiff's Oppo. at 13:9-26 (only addressing *prima facie* case). At the hearing, in response to the Court's question

15

regarding whether plaintiff had "specific and substantial" evidence of pretext, plaintiff's counsel asserted that the evidence of pretext included all of the evidence discussed *supra* regarding Farber's alleged discrimination against other Asian officers in the department.  However, as explained *supra*, plaintiff does not have any admissible evidence that Farber discriminated against officers Le, Young, Hampton or Trieu on account of their race.

Counsel also argued that a factfinder could find pretext based on plaintiff's evidence that similarly situated individuals outside plaintiff's protected class were treated differently.  However, while the Court found plaintiff's evidence that "other" people had also voided tickets without being disciplined sufficient to establish a *prima facie* case, this evidence is not "specific and substantial" to show pretext.  Plaintiff's evidence about similarly situated individuals does not identify the individuals or the circumstances under which they voided parking tickets, and thus the Court cannot make a meaningful comparison between plaintiff and the other individuals.

Finally, counsel argued that there was evidence of pretext because all of the performance issues and disciplinary problems occurred after plaintiff concluded the IA investigation of Trieu in July 2008.  However, it is undisputed that at least some of the performance problems pre-dated July 2008.  Farber counseled plaintiff about the December 30 and 31, 2007 scheduling errors in a January 2, 2008 memo, Farber Decl. Ex. C, and in December 2007, Farber exchanged emails with plaintiff about failing to have some required reports for the FTO program in personnel files.  *Id*. Ex. F.  It is true that a number of the performance issues and resulting discipline occurred after July 2008; however, as discussed *supra*, plaintiff has not submitted any direct evidence of racial discrimination connected to any of these incidents, nor does their timing, in and of itself, constitute "specific and substantial" evidence of pretext.

The Court finds that this is an instance where, "although the plaintiff has established a *prima facie* case . . . no rational factfinder could conclude that the action was discriminatory."  *Reeves*, 530 U.S. at 148 ("an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact . . . .").  The Court may not "find a 'genuine issue' where the only evidence presented is 'uncorroborated and self-serving' testimony."  *Villiarimo*, 281 F.3d at 1061 (citing *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996) (finding a plaintiff's uncorroborated and self-

United States District Court
For the Northern District of California

serving deposition testimony did not present a sufficient disagreement to require submission to a jury)) (internal citation and quotation marks omitted); *Johnson v. Wash. Metro. Area Transit Auth.*, 883 F.2d 125, 128 (D.C. Cir. 1989) ("The removal of a factual question from the jury is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving testimony, unsupported by corroborating evidence, and undermined . . . by other credible evidence . . . ."). Accordingly, the Court finds plaintiff has not met his burden on his discrimination claim, and GRANTS summary judgment in favor of defendants.

### III.    Retaliation

The elements of a First Amendment retaliation claim against a public employer are: (1) the employee engaged in constitutionally protected speech, (2) the employer took an "adverse employment action" against the employee, and (3) the employee's speech was a "substantial or motivating factor" for the adverse action. *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003).

### A.    Protected speech

Defendants contend they are entitled to summary judgment because plaintiff has no evidence that he engaged in protected speech. "An employee's speech is protected under the First Amendment if it addresses 'a matter of legitimate public concern.'" *Id*. (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 571 (1968). "On the other hand, speech that deals with individual personnel disputes and grievances and that would be of no relevance to the public's evaluation of the performance of governmental agencies is generally not of public concern." *Id*. (internal citation and quotations omitted).

Here, plaintiff's alleged protected activity is the initial complaint in this case, filed on October 21, 2009. Plaintiff alleges that after he filed this lawsuit, defendants retaliated against him by imposing discipline on him in January 2010.[13] Defendants argue that the initial complaint in this case is not protected speech because the complaint "was directed exclusively at Farber as an individual and driven

---

[13] It is unclear whether plaintiff is challenging any other acts as retaliatory. The Court addresses this issue *infra*.

solely by Plaintiff's personal employment disputes with him." Reply at 11:6-7.  However, defendants

mischaracterize the allegations of the initial complaint.  The October 21, 2009 complaint, alleged against

both Farber and the City of Millbrae, alleged, *inter alia*, that Farber has "singled out Sgt. Danny Singson

for criticism, verbal harassment and discipline," that "Farber has a history of hostile and discriminatory

treatment of minority officers which includes the failed attempt to cause the termination of another

minority officer," and that the "Chiefs of the City of Millbrae's Police Department knew or should have

known about this harassment and failed to take prompt, effective remedial action reasonably calculated

to end it."  Compl. ¶¶ 14, 33.  Thus, rather than solely alleging individual personnel disputes, the initial

complaint alleged that defendant Farber engaged in racial discrimination against plaintiff, that Farber

had a history of racial animus towards other minority police officers, and that the Department failed to

address the discrimination.  The Court finds that the initial complaint constituted protected activity.  *See*

*Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1038 (9th Cir. 1990) (reversing a directed verdict on First

Amendment retaliation claims brought by Latino police officers, and finding questions of fact as to

whether officers were retaliated against after complaining about racial discrimination by supervising

police officers and department).

### B.   "Substantial or motivating factor"

Defendants contend that the two-day reduction in pay imposed by Chief Violett in January 2010,

was not retaliatory because "the undisputed facts demonstrate that this disciplinary action was based on

the same facts for which Violett had decided to discipline Plaintiff before the lawsuit was filed."  Motion

at 24:9-11.[14]  As such, defendants argue that plaintiff has not raised a triable issue of fact as to whether

the lawsuit was a "substantial and motivating factor" in the imposition of the discipline.  In response,

plaintiff argues that "the discipline was based on the facts of the lawsuit, i.e., alleged misconduct which

---

[14] Defendants also contend that many of the retaliatory actions alleged in the FAC, such as the facts that Raffaelli required plaintiff to submit a daily report of activities, told plaintiff that his entire team was not permitted to leave the field to eat meals together, and counseled plaintiff for performance deficiencies, do not amount to adverse employment actions because they do not involve a "materially adverse change in the terms or conditions of employment."  *Gathenji v. Autozoners, LLC*, 703 F. Supp. 2d 1017, 1030 (E.D. Cal. 2010).  Plaintiff's summary judgment opposition does not address any of these alleged retaliatory acts, and instead only challenges as retaliatory the discipline imposed in January 2010.  *See* Plaintiff's Oppo. at 15:22-28.

occurred before the complaint was filed.  In conceding a relationship between the lawsuit and this discipline, defendants further support the inference that the discipline was only imposed, one month later, because of it."  Plaintiff's Oppo. at 15:23-26.  Plaintiff makes much of Rafaelli's deposition testimony in which, in response to questioning about whether he believed plaintiff's claims that Farber discriminated against plaintiff and other Asians on account of their race, Rafaelli testified that he did not believe that plaintiff's lawsuit was valid, and that he expressed this view to both Farber and Chief Violett.  Rafaelli Depo. at 76:19-79:4 (Scott Decl. Ex. 6). Plaintiff argues that notwithstanding this belief that plaintiff's lawsuit lacked validity, Rafaelli was assigned the IA investigation, which ultimately led to the January 2010 discipline.

The Ninth Circuit has identified three ways in which a plaintiff can show that retaliation was a "substantial or motivating" factor behind a defendant's adverse employment actions.

> First, a plaintiff can introduce evidence regarding the proximity in time between the protected action and the allegedly retaliatory employment decision, from which a jury logically could infer [that the plaintiff] was terminated in retaliation for his speech. Second, a plaintiff can introduce evidence that his employer expressed opposition to his speech, either to him or to others.  Third, the plaintiff can introduce evidence that his employer's proffered explanations for the adverse employment action were false and pre-textual.

*Coszalter*, 320 F.3d at 977 (internal quotations and citations omitted).

The Court finds that although it is a close call, plaintiff has raised triable issues of fact as to whether this lawsuit was a "substantial and motivating" factor behind the January 2010 discipline. Although defendants are correct that Chief Violett first initiated the discipline prior to the filing of the lawsuit, thus weighing against a finding of retaliation, it is also correct that Chief Violett rescinded the initial proposed discipline and decided to await the results of an IA investigation before imposing discipline. The facts that Chief Violett assigned the IA investigation to Rafaelli, that Rafaelli expressed to Violett that he did not believe that plaintiff's lawsuit was valid, that Rafaelli sustained most of the charges against plaintiff, and that the discipline was imposed based upon Rafaelli's investigation, are

United States District Court

For the Northern District of California

1   sufficient to raise a triable issue of fact about whether the lawsuit was a substantial factor behind the

2   imposition of the January 2010 discipline.[15]

3

4   **IV.    Municipal liability**

5        Defendants also contend that as against the City, plaintiff's § 1983 claims should be dismissed

6   because plaintiff has failed to establish municipal liability.  Local governments are "persons" subject

7   to liability under 42 U.S.C. § 1983 where official policy or custom causes a constitutional tort, *see*

8   *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978); however, a city or county may not be held

9   vicariously liable for the unconstitutional acts of its employees under the theory of *respondeat superior*,

10  *see Board of County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997); *Monell*, 436 U.S. at 691; *Fuller v.*

11  *City of Oakland*, 47 F.3d 1522, 1534 (9th Cir. 1995).

12       Municipal liability under Section 1983 may be "by showing that an official with final

13  policymaking authority either delegated that authority to, or ratified the decision of, a subordinate."

14  *Ulrich v. City and County of San Francisco*, 308 F.3d 968, 985 (9th Cir. 2002). The parties dispute

15  whether plaintiff properly amended the complaint to allege that the City may be held liable under a

16  ratification theory, and also whether there is any evidence in support of such a theory.  Plaintiff argues

17  that he amended the complaint to allege that Chief Violett was a policymaker and final decision maker

18  who ratified Rafaelli's retaliation against plaintiff.  *See* FAC ¶¶ 26, 33, 36.  Although defendants argue

19  that these allegations are "boilerplate," the Court finds that these allegations are sufficient to preserve

20  the ratification theory.

21       Defendants also argue that there is no evidence in support of a ratification theory, and thus that

22  the City is entitled to summary judgment on the § 1983 claims.  Defendants assert that the Millbrae City

23  Council, not Chief Violett, is the final authority concerning all personnel decisions, and they note that

24  plaintiff never pursued any administrative appeals to the City Council regarding employment matters,

25

26       [15] Defendants assert, citing Rafaelli's declaration, that they have met their burden to show that
    Rafaelli would have taken the same actions absent this lawsuit.  However, Rafaelli's declaration does
27  not discuss the IA investigation in any detail, and only states that the conducted the investigation and
    sustained most but not all of the charges.  On this record, the Court cannot conclude that defendants
28  have met their burden sufficient to grant summary judgment.

United States District Court
For the Northern District of California

including the January 2010 discipline.  In support of their assertion that the Millbrae City Council is the final policymaking authority, defendants have submitted the declaration of Gary Rogers, the head of the human resources department for the City of Millbrae.  Mr. Rogers states, *inter alia*, "By law, the Millbrae City Council is the final authority concerning all personnel rules, policies, and specific personnel actions concerning City employees.  The City's Personnel Rules and Regulations are adopted and approved by official action of the City Council.  No City employee has the authority to modify, edit, or waive these Rules and Regulations without official action by the City Council."  Rogers Decl. ¶ 4.

Plaintiff does not respond to the Rogers declaration, and instead simply asserts that there is ample evidence that Chief Violett ratified Rafaelli's retaliation.  However, plaintiff's arguments assume that Chief Violett is an official with final policymaking authority.  "The fact that a particular official – even a policymaking official – has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion.  The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482-83 (1986) (citations and footnote omitted); *see also Ulrich*, 308 F.3d at 985.

"[U]nder California law, a city's Charter determines municipal affairs such as personnel matters."  *Hyland v. Wonder*, 117 F.3d 405, 414 (9th Cir. 1997) ("*Hyland II*").  Neither party has submitted the Millbrae city charter, and thus the Court cannot determine whether Chief Violett is a final policymaking authority on matters of Police Department employment policy.  The excerpts of the rules attached to the Rogers declaration do not establish that the City Council is the final policymaking authority concerning employment matters.  Moreover, even if the City Council is the final policymaking authority, Chief Violett may have been delegated final policymaking authority; neither party has submitted any evidence on this point.  *See Ulrich*, 308 F.3d at 985 ("An official may be found to have been delegated final policymaking authority where the official's discretionary decision is not constrained by policies not of that official's making and not subject to review by the municipality's authorized policymakers.") (internal citations and quotations omitted); *see also Hyland II*, 117 F.3d at 415 (holding city liable where final policymaking authority "left the internal management" to the department head "and attempted not to interfere"); *McKinley v. City of Eloy*, 705 F.2d 1110, 1116 (9th

21

Cir. 1983) (holding municipality liable based on trial testimony that "the City had delegated to the city manager the ultimate responsibility for personnel decisions").

Accordingly, the Court DENIES defendant's motion for summary judgment on the question of municipal liability.  This is, however, without prejudice to consideration of the issue at the pretrial conference stage, if the City presents undisputed evidence that Chief Violett did not have final policymaking authority based either on the Millbrae city charter or appropriate delegation.

## CONCLUSION

For the reasons set forth above, the Court GRANTS in part and DENIES in part defendants' motion for summary judgment.  (Docket No. 46).

**IT IS SO ORDERED.**

Dated: December 23, 2010

SUSAN ILLSTON
United States District Judge

United States District Court
For the Northern District of California